# 11-2651-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

»»‹‹

DELIO ALOISIO MATTOS FILHO,

*Plaintiff-Appellant,*

*v.*

SAFRA NATIONAL BANK OF NEW YORK,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR PLAINTIFF-APPELLANT

Philip A. Byler
Andrew T. Miltenberg
NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff-Appellant*
363 Seventh Avenue, Fifth Floor
New York, New York 10001
212-736-4500

**-i-**

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant Delio ("Delio") is an individual to whom Rule 26.1 of the Federal Rules of Appellate Procedure does not apply.

-ii-

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

RULE 26.1 DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .......................................................... vi

PRELIMINARY STATEMENT ........................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 3

ISSUES PRESENTED FOR REVIEW ................................................. 3

STATEMENT OF THE CASE ......................................................... 5

    A.    The Allegations of Plaintiff Filho's Complaint ................................... 5

        1.    The Parties ....................................................... 5

        2.    The Opening Of The Account At The Defendant Bank ............ 5

        3.    Defendant Bank's Transactions For Plaintiff Filho ................. 7

        4.    Defendant Bank Reassures Plaintiff Filho About The
               Investments; The Losses From The High Risk Investments ...... 9

        5.    Plaintiff Filho's Complaint For Damages
               Under Federal and State Law .................................... 11

    B.    Defendant Bank's Motion To Dismiss Or Compel Arbitration ............. 11

        1.    Defendant Bank's Attorney Affidavit ......................... 12

        2.    Plaintiff Filho's Opposition and Plaintiff Filho's Affidavit .... 12

-iii-

3.     Defendant Bank's Reply: Defendant Bank Officer Affidavit...14

a.     The 2002 Standardized Terms and Conditions................14

b.     The Special Services Agreement ......................................16

c.     The 2005 Standardized Terms and Conditions.................16

C.    The District Court's Opinion and Order.................................17

SUMMARY OF ARGUMENT ........................................................................18

ARGUMENT .................................................................................................21

I.    THE DISTRICT COURT MADE A CLEARLY ERRONEOUS FINDING THAT THE REPLACEMENT 2005 TERMS AND CONDITIONS DOCUMENT, WHICH INCLUDED AN ARBITRATION PROVISION, WAS DELIVERED TO PLAINTIFF FILHO AND THUS BECAME EFFECTIVE AS TO PLAINTIFF FILHO.........................................................21

II.   THE DISTRICT COURT ERRED BY NOT RECOGNIZING NEW YORK LAW THAT AN AGREEMENT TO ARBITRATE MUST BE EXPRESS AND UNEQUIVOCAL........................25

III.  THE DISTRICT COURT ERRED BY MISREADING THE CREDIT CARD CASES FOR AN UNSUPPORTABLE CONVERSE PROPOSITION ..........................................................................28

A.    The District Court's Reading Of The Credit Card Cases For A Converse Proposition................................29

B.    A More Detailed Review Of The Credit Card Cases Shows That They Cannot Be Read To Support The District Court's Converse Proposition ..........................................................30

1.     *Stone v. Golden Wexler & Sarnese, P.C.* ....................................30

-iv-

2.   *Follman v. World Financial Network National Bank* ...............32

3.   *Perry v. FleetBoston Financial Corp.* ........................................34

4.   *Sears Roebuck & Co. v. Avery* ....................................................36

5.   *Badie v. Bank of America* ...........................................................38

IV.  THE DISTRICT COURT ERRED BY READING TWO NEW YORK CASES, ONE REVERSED AND ONE INAPPOSITE, AS SUPPORTIVE OF THE DISTRICT COURT'S CONVERSE PROPOSITION.....................40

A.   *In re American Express Merchants Litigation*.....................................40

B.   *Krupp v. Franklin Savings Bank in City of New York*.........................42

V.  THE DISTRICT COURT ERRED IN INTERPRETING THE CHANGE-OF-TERMS PROVISION IN THIS CASE TO AUTHORIZE DEFENDANT BANK TO SPECIFY ARBITRATION FOR DISPUTE RESOLUTION BASED ON A LITERAL READING OF THE 2002 TERMS AND CONDITIONS AND THE DISTRICT COURT'S CONVERSE PROPOSITION FROM THE CREDIT CARD CASES ..........43

A.   The District Court's Interpretation Of The Change-Of- Terms Provision ................................................................43

B.   The District Court's Interpretation Of The Change-Of-Terms Provision Was Erroneous ........................................45

1.   New York Law Requires An Express And Unequivocal Agreement To Arbitrate That Was Not Provided By Plaintiff Filho Signing An Account Application ........................45

2.   The Credit Card Cases and Other Cases Do Not Support The District Court's Converse Proposition ..................46

3.   Court Litigation Is The Default Means Of Dispute Resolution.. 47

-v-

4.   The District Court's Interpretation Is Inconsistent
      With General Contract Law Limitations On
      Contracts of Adhesion...............................................................49

5.   The District Court's Interpretation Is Inconsistent
      With General Contract Law Limitations On
      Change-Of-Terms Provisions ......................................................51

VI.  THE DISTRICT COURT ERRED IN REJECTING APPLICATION OF
      § 5-1103 OF THE NEW YORK GENERAL OBLIGATIONS LAW
      BECAUSE THE DISTRICT COURT OVERLOOKED THAT WHAT
      DEFENDANT BANK PURPORTEDLY DID IN 2005 WAS TO
      REPLACE THE TERMS AND CONDITIONS IN THEIR ENTIRETY.........54

VII. THE DISTRICT COURT ERRED FACTUALLY AND LEGALLY
      WHEN REJECTING PLAINTIFF FILHO'S ARGUMENT
      THAT HE NEVER AGREED TO ARBITRATION OF DISPUTES ............56

A.   The District Court's "Clearly Erroneous"
      Treatment Of The Record .......................................................56

B.   The District Court Was Legally Wrong In
      Holding Plaintiff Filho Was Bound To Arbitration ............................59

CONCLUSION ..................................................................................59

CERTIFICATE OF COMPLIANCE

-vi-

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alex Gilman Inc. v. Silverman Products & Textiles, Inc.*,
212 A.D.2d 452, 622 N.Y.S.2d 728 (1ˢᵗ Dep't 1995) .............................. 28, 46

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986) ....................................................................................26

*Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 6 Cal.Rptr. 31 (1960) ...53

*Badie v. Bank of America*, 67 Cal.App.4th 779,
79 Cal.Rptr.2d 273 (Cal. Ct. App. 1999).........................................31, 32, 35, 36,
37, 38-39, 43,
52, 53, 54-55

*Bell v. Hood*, 293 F.3d 563 (2d Cir. 2002)................................................................27

*Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148,
840 P.2d 1013 (Ariz. S.Ct. 1992) ..............................................................49, 50

*Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246,
676 N.Y.S.2d 569 (1ˢᵗ Dep't 1998) ................................................................. 57

*Cowen & Co. v. Anderson*, 76 N.Y.2d 318, 558 N.E.2d 27,
559 N.Y.S.2d 225 (1990) .................................................................................26

*Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383,
682 P.2d 388 (Ariz. S.Ct. 1984) ....................................................................50

*Demasse v. ITT Corp.*, 194 Ariz. 500, 984 P.2d 1138 (Ariz. S.Ct. 1999) ...............52

*DIRECTTV, Inc. v. Mattingly*, 376 Md. 302, 829 A.2d 626 (2003) ........................26

*Engler v. Mahoney*, 258 A.D.2d 859,.S.2d 686 N.Y 169 (3d Dep't 1999) .............27

-vii-

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)...........................25, 26

*Follman v. World Financial Network National Bank*,
    721 F.Supp.2d 158 (E.D.N.Y. 2010) ...........................................26, 32-34, 35,
                                                38, 43, 50

*Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87 (R.I. 1992) ...............................35

*Godfrey v. Eastman Kodak Co.*, 1991 WL 64463 (S.D.N.Y. 1991) .........................49

*Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 171 Cal. Rptr. 604,
    623 P.2d 165 (1981) ...................................................................................50

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 780 N.E.2d 166,
    750 N.Y.S.2d 565 (2002) .............................................................................43

*Hawkeye Funding Ltd. Partnership v. Duke/Fluor Daniel*,
    307 A.D.2d 828, 783 N.Y.S.2d 574 (1st Dep't 2003) ......................................26

*In re American Express Merchants Litigation*, No. 03 Civ. 9562,
    2006 WL 662341 (S.D.N.Y. 2006), *rev'd*, 554 F.2d 300
    (2d Cir. 2009), *vacated and remanded for further consideration*,
    130 U.S. 2401 (2010) ...............................................................................40-41

*Krupp v. Franklin Savings Bank in City of New York*, 255 A.D. 15,
    5 N.Y.S.2d 365 (1st Dep't 1938) ...............................................................40, 42

*Kurz v. Chase Manhattan Bank USA*, 319 F.Supp.2d 457 (S.D.N.Y. 2004) .........22-23

*Lamb v. Emhart Corp.*, 47 F.3d 551 (2d Cir. 1995) ...........................................53, 55

*Maestle v. Best Buy Co.*, 2005 WL 1907282 (Ohio Ap. 8th Dist. 2005) ...................33

*Marek v. Alexander Laufer and Son, Inc.*, 257 A.D.2d 363,
    683 N.Y.S.2d 50 (1st Dep't 1999) .......................................................26, 27, 46

-viii-

*Marlene Industries Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327,
380 N.E.2d 239, 408 N.Y.S.2d 410 (1978) .....................................................27

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ......................25

*Perry v. FleetBoston Financial Corp.*, No. 04 Civ. 507,
2004 WL 1508518 (E.D. Pa. 2004) ...................................................34-36, 38,
41, 48, 50,
52-53

*Rochelle Fabrics, Ltd. v. Top Kid's, Inc.*, 247 A.D.2d 232,
668 N.Y.S.2d 589 (1st Dep't 1998)...................................................27

*Sablosky v. Edward S. Gordon*, 73 N.Y.2d 133, 535 N.E.2d 643,
538 N.Y.S.2d 513 (1989)...................................................26

*Sears Roebuck and Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004) .......36-37, 38,
49, 50, 52

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 599 U.S. __,
130 S.Ct. 1758 (2010) ...................................................41

*Stone v. Golden Wexler & Sarnese, P.C.*,
341 F.Supp.2d 189 (E.D.N.Y. 2004) ...................................................25, 30-32, 33, 34,
35, 38, 41, 43, 52, 53

*Tsadilas v. Providian National Bank*, 13 A.D.3d 190,
786 N.Y.S.2d 478 (1st Dep't 2004) .............................................................56-57

*Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989) ...................................................26

*Webb v. GAF Corp.*, 936 F.Supp. 1109 (N.D.N.Y. 1996) .......................................52

*Westchester Resco Co., LP v. New England Reinsurance Corp.*,
818 F.2d 2 (2d Cir. 1987) ...................................................44

**-ix-**

*Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 133 Cal. Rptr. 775 (1976).........49


## Statutes and Rules

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* .................................................... 25, 26

New York General Obligations Law, § 5-1103 .............................................2, 4, 54-56

28 U.S.C. § 1291 ...........................................................................................................3

Rule 4(a), Federal Rules of Appellate Procedure ......................................................3


## Other Authorities

*Corbin on Contracts*, § 98 ........................................................................................53

E.A. Farnsworth, *Contracts*, § 4.26 (4th ed. 2004) ...................................................49

N.Y. Jur.2d, *Arbitration*, § 12 (2009)........................................................................26

Second Restatement of Contracts, § 211 and comments ...........................36-37, 49-50

## PRELIMINARY STATEMENT

Plaintiff-Appellant Delio Alosio Mattos Santos Filho ("Plaintiff Filho") appeals from the Opinion and Order dated and filed May 25, 2011 rendered by Southern District Judge John F. Keenan. The Memorandum and Order is reported at 2011 WL 2118729.

This case poses the question whether a bank, based solely on a "change-of-terms" provision in the original standardized contract with the customer, can unilaterally change the banking contract in its entirety and thereby, among other things, specify for the first time that arbitration would resolve disputes.

The District Court ruled that Defendant Safra National Bank of New York ("Defendant Bank") could invoke a change-of-terms provision in the 2002 Terms and Conditions banking contract with Plaintiff Filho in order to issue a new 2005 Terms and Conditions banking contract that, among other things, changed the dispute resolution clause to arbitration.

In reaching that conclusion, the District Court made a series of major errors:

(I) The District Court made a clearly erroneous finding that the replacement 2005 Terms and Conditions document, which included the arbitration provision, was delivered to Plaintiff Filho and thus became effective as to Plaintiff Filho, when in fact, no delivery occurred, not even to "Hold Mail" for Plaintiff Filho.

-1-

(II) The District Court failed to recognize and apply New York law requiring that an agreement to arbitrate be express and unequivocal.

(III) The District Court misread, to establish a converse proposition, a line of credit card cases in which the courts considered Banks' invoking change-of-terms provisions in credit card contracts so as to specify arbitration for dispute resolution and the courts *rejected* that change and *denied* motions to compel arbitration.

(IV) The District Court misread two cases, a reversed decision involving trade merchants and American Express and an inapposite decision involving a Bank by-law amendment authorized by statute, as supporting the District Court's analysis.

(V) The District Court erroneously interpreted the change-of-terms provision in this case to authorize Defendant Bank to specify arbitration for dispute resolution based on a misconceived literal reading of the 2002 Terms and Conditions document and a misreading of the line of credit card cases.

(VI) The District Court erroneously rejected the application of § 5-1103 of the New York General Obligations Law requiring a signed writing for contract modifications, as what Defendant Bank purportedly did in 2005 was a contract modification to replace the Terms and Conditions in their entirety.

(VII) The District Court erroneously rejected Plaintiff Filho's argument that he never agreed to arbitration of disputes.

-2-

## JURISDICTIONAL STATEMENT

The appeal is from an Opinion and Order of the District Court compelling arbitration and dismissing the Complaint without prejudice and thus is an appeal as of right to this Court pursuant to 28 U.S.C. § 1291and Rule 4(a) of the Federal Rules of Appellate Procedure.

## ISSUES PRESENTED FOR REVIEW

Whether the District Court committed reversible error in granting the motion to compel arbitration and dismiss the Complaint without prejudice in favor of arbitration proceedings raise a series of legal issues subject to *de novo* review by this Court:

1. Did the District Court make a clearly erroneous finding that the replacement 2005 Terms and Conditions document, which included an arbitration provision, was delivered to Plaintiff Filho and thus became effective as to Plaintiff Filho when in fact no delivery occurred, not even in "Hold Mail" for Plaintiff Filho?

2. Did the District Court erroneously fail to recognize that New York law requires that an agreement to arbitrate be express and unequivocal?

3. Did the District Court misread, in order to establish an unsupportable converse proposition, a line of credit card cases in which the courts considered the

Banks' invoking of change-of-terms provisions in credit card contracts so as to specify arbitration as the means of dispute resolution and the courts *rejecting* that change and *denying* motions to compel arbitration?

4. Did the District Court misread two New York cases, one a reversed decision involving trade merchants and American Express and the other an inapposite 73-year old decision involving a Bank by-law amendment authorized by statute governing lost passbooks, as supporting the District Court's analysis?

5. Did the District Court erroneously interpret the change-of -terms provision in this case to authorize Defendant Bank to specify arbitration for dispute resolution based on a misconceived literal reading of the 2002 Terms and Conditions document and the District Court's unsupportable converse proposition from the credit card cases?

6. Did the District Court erroneously reject application of § 5-1103 of the New York General Obligations Law requiring a signed writing for contract modifications, as what Defendant Bank purportedly did in 2005 was a contract modification to replace the Terms and Conditions in their entirety?

7. Did the District Court, due to factual and legal errors in the Opinion and Order, erroneously reject Plaintiff Filho's argument that he never agreed to arbitration of disputes?

## STATEMENT OF THE CASE

The District Court's decision was based on a record consisting of the Complaint and the motion papers with respect to Defendant Bank's motion to dismiss or compel arbitration.

### A.    The Allegations of Plaintiff Filho's Complaint.

####    1.    The Parties.

Plaintiff Filho is a Brazilian citizen residing in Rio de Janeiro. Defendant Bank is a New York banking corporation with its principal place of business at 546 Fifth Avenue, New York, New York. (JA 7-8.)

### 2.    The Opening Of The Account At Defendant Bank.

On or about July 1, 2002, Plaintiff Filho was visited in his office in Rio de Janeiro by Mr. Carlos Naslausky, who was offering services of private banking in the United States at the Defendant Bank. Mr. Naslausky was listed at the Financial Industry Regulatory Authority ("FINRA"), as having worked as a Registered Broker for Safra Securities Corporation from September 2002 through February 2006. During that visit, Plaintiff Filho explained to Mr. Naslausky that: (i) he (Plaintiff Filho) had received legal fees from services rendered to a foreign client and that those fees were deposited in an account in Euros in Portugal; (ii) he (Plaintiff Filho) could not take any risks with these funds because they were tied to a purchase of a certain real property

in Brazil that was the subject of litigation; and (iii) because the timing of court approval for the sale of the real property could not be predicted, the money had to be available for him at all times and upon demand. Mr. Naslausky reassured Plaintiff Filho stating that he (Mr. Naslausky) would take care of Plaintiff Filho. (JA 8-9.)

At that time, Plaintiff Filho signed several documents in blank for the opening of an account, including a document entitled "International Application/Customer Profile." These account opening documents were filled out by Mr. Naslausky for Plaintiff Filho. The account opening documents were approved by the Defendant Bank's Compliance Department a few weeks later on August 1, 2002, and Defendant Bank opened an account for Plaintiff Filho. Defendant Bank did not, however, provide to Plaintiff Filho a copy of the signed account opening documents and did not provide Defendant Bank's "Terms and Conditions." Instead, after the opening of the account in 2002 and thereafter until late 2009, Defendant Bank sent, to "Hold Mail," account opening documents and other subsequently generated account documents such as Term Sheets. (JA 9-10.)

In the "Investment Profile" portion of the account opening documents, Plaintiff Filho was described as a conservative investor. The only boxes checked to place his funds were "Demand Deposit," "Mutual Funds," "Money Markets," "US Equities" and "Time Deposits." There was no authorization from Plaintiff Filho for investments in

Emerging Market Equities or Debt, Options and Derivative Instruments. The Defendant Bank's "International Banking Terms and Conditions" provided that the customer would select all financial instruments and securities without the Bank's recommendation or advice. (JA 9-10.)

Sometime around August 2002, Plaintiff Delio caused 160,000.00 Euros to be transferred to his account at the Defendant Bank. On or about December 4, 2002, Mr. Naslausky called Plaintiff Filho, telling him (Plaintiff Filho) that the best course of action for Plaintiff Filho was to sell his Euros and purchase U.S. Dollars. Acting in reasonable reliance on a bank officer who had represented that the bank officer would protect Plaintiff Filho's interests, Plaintiff Filho sent to Defendant Bank a written authorization to convert, into U.S. Dollars, the Euros deposited then in his account; and in accordance with Plaintiff Delio's investment profile, Mr. Naslausky invested the funds in 5-year Certificates of Deposit that would mature in February 2007. U.S. Dollars, however, thereafter fell in value and failed to recover. (JA 11.)

**3. Defendant Bank's Transactions For Plaintiff Filho.**

Over four years after the opening of the account, in November 2006, Plaintiff Filho called the Defendant Bank and was told by a new account officer, Ms. Camilla Ferreira, that Mr. Naslausky had left the Defendant Bank many months earlier and that she (Ms. Ferreira) had been appointed his new account officer. Ms. Ferreira told

Plaintiff Filho that Plaintiff Filho's funds were just sitting in the checking account incurring fees. (JA 11.)

The following month, in December 2006, Ms. Ferreira sent an e-mail stating she had been studying some products providing a higher return at a short-medium term; and in the next month, January 2007, Ms. Ferreira wrote to Plaintiff Filho that she (Ms. Ferreira) had obtained approval of the Defendant Bank to compensate Plaintiff Filho for money left unattended in a checking account. (JA 12.)

Starting in March 2007 and continuing for the next 1½ years to August 2008, the Defendant Bank officers engaged in a series of high risk financial transactions with Plaintiff Filho's account money but without his authorization and knowledge:

(i) on March 9, 2007, a $100,000 3-month 12% per annum Structured Note issued by Lehman Brothers based on a Brazilian company Vale do Rio Doce, a Brazilian emerging market company (JA 12-14);

(ii) on March 12, 2007, a $50,000 16% per annum 3-month Structured Note issued by Lehman Brothers Note based on three Brazilian emerging market companies Gerdau, Cia Siderurgica National and Unibanco (JA 15);

(iii) on July 26, 2007, a 3-month Structured Note issued by BNP Paribas Arbitrage Issuance CV based on "3-Month 'Worst Of' Certificates linked" to three Brazilian emerging market companies and paying 19% per annum (JA 15);

(iv) on October 25, 2007, a 3-month Structured Note issued by Macquarie Limited based on Brazilian emerging companies and paying

19% per annum (JA 15-16); (v) on January 23, 2008, a 3-month Structured Note based on "3-Month 'Worst Of' Certificates linked" to Brazilian emerging companies and paying 22.08% per annum (JA 16);

(vi) On March 19, 2008, a 3-month Reverse Convertible Note linked to three Brazilian emerging companies and paying 24% per annum (JA 16-17);

(vii) on April 25, 2008, a 3-month Note based on a "Worst-Of" Reversible Convertible linked to emerging Brazilian companies (JA 17);

(viii) on April 29, 2008, "Lesser of Reverse Convertible Notes Linked to the Common Stock of Potash Corp. of Saskatchewan, Inc. and Mosaic Co.," two companies engaged in commodities production (JA 17);

(ix) on June 16, 2008, a "3 Month Reverse Convertible" Note from Cia Vale do Rio Doce- American Depository Receipts in U.S. Dollars, which was paying 13.01% per year for 3 months (JA 17-18);

(x) on July 29, 2008, an " "Autocallable Lock-Up at Hit Equity Linked Note," the underlying securities of which were the commodity companies Agrium Inc., Apache Corp., and Transocean Inc. (JA 18); and

(xi) on August 4, 2008, a 6-month Trigger Certificate linked to Monsanto Co., Mosaic Co. and Potash Co. of Saskatchewan (JA 18-19).

### 4. Defendant Bank Reassures Plaintiff Filho About The Investments; The Losses From The High Risk Investments.

On or about October 6, 2008, Plaintiff Filho called Ms. Ferreira to check on his account, as Plaintiff Filho was not receiving account statements, and Ms. Ferreira sent him an e-mail informing him that she had bought three notes: (i) a 6-month Trigger Certificate linked to Monsanto Co., Mosaic Co. and Potash Co. of Saskatchewan,

commenting that the three were fertilizer companies; (ii) an "Autocallable Lock-Up at Hit Equity Linked Note" based on a fertilizer company Agrium, a natural gas company and a deep water oil exploitation company; and (iii) a $50,000 "3 Month Reverse Convertible" Note from Cia Vale do Rio Doce-American Depository Receipts. Ms. Ferreira's e-mail did not identify the purchased Notes as high risk, did not acknowledge that the instruments were appropriate only for sophisticated investors and did not acknowledge that she had not procured Plaintiff Filho's authorization for the purchases. (JA 19-20.)

Despite Defendant Bank's reassurances about these investments, the markets in them dropped substantially. On June 16, 2008, the $50,000 Note in Vale do Rio Doce-American Depository Receipts had on June 16, 2008 the market price of only $25,852.50, reflecting a loss of nearly 50% of the purchased value. (JA 20.) On February 4, 2009, the 6-Month Trigger Certificate linked to Monsanto Co., Mosaic Co and Potash Co. of Saskatchewan matured, at which time the $60,000 investment dropped in value to $18,081.00. On or about July 29, 2009, the one-year "Autocallable Lock-Up at Hit Equity Linked Note" matured, at which time Plaintiff Filho received $840.07 in cash and 600 shares of stock a fertilizer company Agrium -- which meant that there had been over a 50% fall from the $60,000 that had been paid for the Note one year prior. (JA 20-21.)

-10-

On or about July 31, 2009, Plaintiff Filho called the Defendant Bank because there were developments regarding the real property in Brazil for which the funds deposited at the Defendant Bank had been earmarked. Plaintiff Filho was told that Ms. Ferreira no longer worked at the Defendant Bank and that Plaintiff Filho's new account officer was Mr. Marco Amorim. Plaintiff Filho contacted Mr. Amorim, and to Plaintiff Filho's shock, Mr. Amorim informed Plaintiff Filho that his account had lost over 50% of its value. Plaintiff Filho told Mr. Amorim that this was not possible because Ms. Ferreira had told him that he would always receive the principal plus interest. On or about August 14, 2009, Mr. Amorim sent an e-mail to Plaintiff Filho saying that he (Mr. Amorim) had not "identified any messages from Ferreira that guaranteed the principal." (JA 21-22.)

### 5. Plaintiff Filho's Complaint For Damages Under Federal and State Law.

Plaintiff Filho's Complaint for damages was brought under state law and federal law. (JA 22-37.)

### B. Defendant Bank's Motion To Dismiss Or Compel Arbitration.

In response to the Complaint, Defendant Bank moved to dismiss or to compel arbitration. (JA 39-138.)

1.     **Defendant Bank's Attorney Affidavit.**

The initial evidentiary basis for Defendant Bank's motion was a declaration of Defendant Bank's retained litigation attorney who did not have the requisite personal knowledge to testify but who nevertheless submitted Defendant Bank's 2002 banking contract ("SNB International Banking Terms and Conditions"), a purported 2005 banking contract ("SNB General Terms and Conditions") and a Special Services Agreement.  (JA 42-101, 167.)

2.     **Plaintiff Filho's Opposition and Plaintiff Filho's Affidavit.**

Plaintiff Filho opposed the motion, defending the Complaint, objecting to the improper attorney affidavit and submitting the Affidavit of Plaintiff Filho testifying to the facts.  (JA 139-182.)  Plaintiff Filho testified about, among other things:

(i) the opening of the account in July 2002 with Bank officer Mr. Naslausky who assured Plaintiff Filho of the safety of the account monies (JA 141-142);

(ii) Plaintiff Filho's call to Defendant Bank in November 2006 and learning that Ms. Ferreira was the new account officer (JA 143);

(iii) Plaintiff Filho's call to Defendant Bank in October 2008 and being assured about the investments that Defendant Bank had made (JA 144);

(iv) Plaintiff Filho's call to Defendant Bank in July 2009 and learning

**-12-**

that Mr. Amorim was the account officer and that his account had lost over 50% of its value (JA 144);

(v) Plaintiff Filho's request in September 2009 for his mail that had been held by Defendant Bank and Plaintiff Filho's receipt in December 2009 of his mail that had been held by Defendant Bank (JA 145);

(vi) the fact that his mail that had been held by Defendant Bank included what appeared to be the purported 2002 Terms and Conditions between Plaintiff Filho and Defendant Bank albeit without the first page (JA 146);

(vii) the fact Plaintiff Filho was not shown and not given a copy of the 2002 Terms and Conditions when the account was opened (JA 146);

(viii) the fact Plaintiff Filho was never notified and never informed that the Defendant Bank had purportedly modified the banking contract in 2005 (JA 145-146);

(ix) the fact Plaintiff Filho was never given the opportunity to accept, refuse or opt-out from the purported 2005 contract modification of having arbitration as the means of dispute resolution (JA 146);

(x) the fact that Plaintiff Filho's mail that had been held by Defendant Bank did not include the purported 2005 "SNB General Terms and Conditions" (JA 146-147);

-13-

(xi) the fact Plaintiff Filho never saw and never signed the purported 2005 banking contract ("SNB General Terms and Conditions")(JA 146-147).

**3.      Defendant Bank's Reply: Defendant Bank Officer Affidavit.**

In reply, Defendant Bank submitted a short affidavit by its Chief Compliance Officer Peter Javier authenticating, but not discussing, an original 2002 banking contract ("SNB International Banking Terms and Conditions"), a purported 2005 banking contract ("SNB General Terms and Conditions") unsigned by the parties and Defendant Bank's Special Services Agreement with Plaintiff Filho signed by Plaintiff Filho.  (JA 183-184 & Exs. 1-3.)  The affidavit by the Defendant Bank's Chief Compliance Officer Pete Javier stated that a customer did not have the opportunity to opt out of the 2005 Terms and Conditions and did not have the opportunity to change the "Hold Mail" arrangement; however, Defendant Bank's Chief Compliance Officer Pete Javier did not make any statement in his affidavit about the delivery of the 2005 banking contract to Plaintiff Filho.  (JA 183-184.)

**a.      The 2002 Standardized Terms and Conditions.**

The 2002 standardized 11-page banking contract ("SNB International Banking Terms and Conditions") contained 31 numbered sections in small print covering such subjects as the treatment of deposits, joint accounts, interest, fees, assignment, limitations on the Bank's liability, hold mail, statements and bank correspondence,

closing of accounts, governing law, collateral and security agreements. (JA 45-55.) Section 12, entitled "Hold All Mail," provides among other things that "All correspondence retained by us, including notices having legal consequences or affecting these Terms and Conditions, shall be deemed to have been delivered to you on the date which appears on the correspondence or on the mailing list held with us and shall be effective notwithstanding your lack of knowledge of the contents of such correspondence." (JA 49.) Section 27 provided that the customer consented to submit to the non-exclusive jurisdiction of any state or federal court sitting in the district in which the office at which any account is maintained. (JA 53.) Section 28 stated in full as follows:

> The Bank reserves the right to change these Terms and Conditions as well as schedule of charges and to add any new charges. Any such change in the Terms and Conditions or new charges will only become effective 10 days following delivery of a notice to you at your last address as shown on the Bank records or if the Bank shall otherwise make notice of such change or new charges available to you.
>
> No ambiguity in any provision in these Terms and Conditions or in the Client Application shall be construed against the Bank by reason of the fact that the Bank or its legal counsel drafted such provision. These Terms and Conditions and the Client Application shall bind any successors, heirs, executors and other legal representatives of any account holders.

(JA 53.)

-15-

### b.    The Special Services Agreement.

The Special Services Agreement is a one-page document that has the "Hold Mail" line check marked and an Acknowledgment of receiving and agreeing to the International Banking Terms and Conditions.  Plaintiff Filho's signature appears on this document.  (JA 76.)

### c.    The 2005 Standardized Terms and Conditions.

The unsigned purported 2005 standardized 18-page banking contract "General Terms and Conditions"  -- the one Plaintiff Filho testified without contradiction he never received (JA 146-147) -- contained 36 numbered sections in small print covering such subjects as joint accounts, fees, account statements, deposits, withdrawals, overdrafts, hold mail, closing of accounts, governing law, FDIC insurance and limitation of Bank liability.  (JA 57-74.)  Section 22 stated in pertinent part:

> **a.** If any dispute controversy or claim ("Claim") arising out of or relating to any business relationship between you and the Bank, including, without limitation, any claim with regard these General Terms and Conditions and any account or transaction you have with the Bank cannot be settled through direct discussions between you and the Bank, such Claim shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . . All arbitration hereunder shall be conducted in the State of New York in English.  Any decision or award rendered by the arbitrator(s) shall be final and binding on you and the Bank, and a judgment may be entered thereupon in any court of competent jurisdiction.  You and the Bank acknowledge and agree that: (i) each hereby consents, for itself, to the jurisdiction of the State of New York for all purposes relative to an

-16-

arbitration and the entry of judgment; (ii) each hereby waives, for itself, pursuant thereto, the right to seek remedies in court, including without limitation, a trial by jury and punitive damages; (iii) arbitration is final and binding; (iv) pre-arbitration discovery is generally more limited than and different from court proceedings; (v) the arbitrator(s) award is not required to include factual findings or legal reasoning and any party's right to appeal or seek modification of rulings by the arbitrator(s) is strictly limited; and (vi) the arbitrator(s) may include an individual(s) who were or are affiliated with the banking or securities industry.

**b.** You agree to pay the Bank for all losses, costs and expenses (including, without limitation, attorney's fees) incurred by the Bank and relating to your account(s) as a result of: . . . (v) any action taken by the Bank to resolve or comply with any claim, dispute, investigation or to protect the Bank's interest in connection with your account(s) and/or your relationship with the Bank. . . .

(JA 67.)

## C.    **The District Court's Opinion and Order.**

\_\_\_\_\_The District Court's opinion and Order granted the motion to compel arbitration and dismissed the action without prejudice in favor of arbitration proceedings, noting that Defendant Bank's motion to dismiss was not reached. The District Court relied upon the change-of-terms section in the 2002 banking contract to hold that Defendant Bank could in 2005 change the banking contract to requiring arbitration for dispute resolution. The District Court also ruled that all the claims of Plaintiff Filho's Complaint were arbitrable. (JA 200-220.) The analysis and rulings in the District Court are discussed below in the Summary of Argument and the Argument.

## SUMMARY OF ARGUMENT

The District Court's Opinion and Order should be reversed, containing as it does a series of major errors.

1. The first major error by the District Court was making a clearly erroneous finding that the replacement 2005 Terms and Conditions document, which included an arbitration provision, was delivered to Plaintiff Filho and thus became effective as Plaintiff Filho. There is no evidence in the record and no argument that the 2005 Terms and Conditions document was ever delivered to Plaintiff Filho and thus, the change specifying arbitration as the means of dispute resolution was not effective as to Plaintiff Filho per the 2002 Terms and Conditions.

2. The second major error by the District Court was not recognizing a point of New York law providing a needed and proper framework to consideration of the specific issue in this case: that New York law requires that an agreement to arbitrate be express and unequivocal, which has meant that arbitration provisions in form contracts have been disallowed.

3. The third major error by the District Court was misreading, to establish a converse proposition, a line of credit card cases in which the courts considered the Banks' invoking of change-of-terms provisions in credit card contracts so as to specify arbitration as the means of dispute resolution and the courts *rejected* that change and

*denied* motions to compel arbitration. The credit card cases reflect more general contract law limitations on contracts of adhesion and change-of-terms provisions.

4. The fourth major error Court by the District was misreading two New York cases, one a reversed decision involving trade merchants and American Express and the other an inapposite 73 year old decision involving a Bank by-law amendment authorized by statute governing lost passbooks, as supportive of the District Court's analysis.

5. The fifth major error by the District Court was interpreting the change-of - terms provision in this case to authorize Defendant Bank to specify arbitration for dispute resolution based on a literal reading of the 2002 Terms and Conditions document and the District Court's converse proposition from the credit card cases. The interpretation was erroneous: (i) New York law requires an express and unequivocal agreement to arbitrate that was not provided by Plaintiff Filho signing an account application; (ii) the credit card cases and other cases do not support the District Court's converse proposition; (iii) court litigation is the default mechanism for dispute resolution and thus the existence of an express provision for court litigation does not mean that a change-of-terms provision may be invoked to specify arbitration for dispute resolution; (iv) the District Court's interpretation is inconsistent with general contract law limitations on contracts of adhesion arising from doctrines of

-19-

good faith, reasonable expectations and unconscionability; and (v) the District Court's interpretation is inconsistent with general contract limitations on change-of-terms provisions that would otherwise make a contract illusory.

6. The sixth major error by the District Court was in rejecting application of § 5-1103 of the New York General Obligations Law requiring a contract modification, if not supported by consideration, to be in a writing signed by the parties because the District Court overlooks that what Defendant Bank purportedly did in 2005 was to replace the Terms and Conditions in their entirety. Such a wholesale replacement is a contract modification subject to § 5-1103 of the New York General Obligations Law, and that statute was unquestionably not satisfied in this case.

7. The seventh major error by the District Court was rejecting Plaintiff Filho's argument that he never agreed to arbitration of disputes: (A) the District Court failed to address the indisputable fact that Plaintiff Filho never received, even in "Hold Mail," the 2005 Terms and Conditions document and thus its arbitration provision could not become effective as to Plaintiff Filho per the change-of-terms provision in the 2002 Terms and Conditions document; and (B) the District Court was legally wrong when stating that Plaintiff Filho was bound by the arbitration provision in the 2005 Terms and Conditions document.

**ARGUMENT**

Before this Court is Plaintiff Filho's appeal of the District Court's Opinion and Order, which should be reversed based on the following discussion demonstrating the series of major errors committed by the District Court

**I.**

**THE DISTRICT COURT MADE A CLEARLY ERRONEOUS FINDING THAT THE REPLACEMENT 2005 TERMS AND CONDITIONS DOCUMENT, WHICH INCLUDED AN ARBITRATION PROVISION, WAS DELIVERED TO PLAINTIFF FILHO AND THUS BECAME EFFECTIVE AS TO PLAINTIFF FILHO**

The first major error by the District Court was making a clearly erroneous finding that the replacement 2005 Terms and Conditions document, which included an arbitration provision, was delivered to Plaintiff Filho and thus became effective as Plaintiff Filho.

In the Background section of the District Court's Opinion and Order, a subsection with the heading "SNB Changes The Terms and Conditions To Include an Arbitration Clause," there is a discussion of: the 2002 Terms and Conditions including a "change of terms and conditions" provision that enabled changes to be made and to be effective 10 days following the delivery of the changed terms and conditions; the 2002 Terms and Conditions also including a "Hold Mail" provision deeming delivery of a document by Defendant Bank to "Hold Mail" effective on the date of the

-21-

document; the purported 2005 Terms and Conditions replacing the 2002 Terms and Conditions; and the 2005 Terms and Conditions specifying arbitration as the means of dispute resolution.  (JA 204-206.)

There is, however, no evidence in the record that the 2005 Terms and Conditions document was ever delivered to Plaintiff Filho.  The testimony of Plaintiff Filho is that the 2005 Terms and Conditions document was not in "Hold Mail" and that he was never notified and never informed otherwise that the Defendant Bank had purportedly modified the banking contract in 2005.  (JA 146-147.)  The testimony of Defendant Bank officer Peter Javier was to authenticate the 2002 and 2005 Terms and Conditions documents and to stated that a customer did not have the opportunity to opt out of the 2005 Terms and Conditions and did not have the opportunity to change the "Hold Mail" arrangement; however, Defendant Bank officer Peter Javier did not make any statement about the delivery of the 2005 banking contract to Plaintiff Filho in "Hold Mail."  (JA 183-184.)

Before the District Court, Defendant Bank cited *Kurz v. Chase Manhattan Bank USA*, 319 F.Supp.2d 457 (S.D.N.Y. 2004), for the proposition that evidence of "proper mailing" establishes a rebuttable presumption of receipt of the mailed document.  The District Court did not adopt it, but the argument was in any event completely without merit for three reasons: (i) there is no evidence of any mailing, even to "Hold Mail,

much less evidence of a proper mailing to Plaintiff Filho of the 2005 Terms and Conditions document; (ii) *Kurz* does not stand for the proposition that sending a document to "Hold Mail" qualifies as a "proper mailing"; and (iii) even had there been evidence of a "proper mailing" (which three was not), the testimony of Plaintiff Filho rebuts the presumption because Plaintiff Filho testified that the purported 2005 Terms and Conditions document was not in "Hold Mail" and he never, ever received the purported 2005 Terms and Conditions document containing the arbitration clause (JA 146-147).

In short, there is nothing in the record and no argument to support a finding that Defendant Bank delivered the replacement 2005 Terms and Conditions document to Plaintiff Filho and thus changed its Terms and Conditions as to Plaintiff Filho to include an arbitration provision. It follows that even if there was a change in 2005 in the Terms and Conditions document of Defendant Bank that Defendant Bank offered to other customers, it was not effective as to Plaintiff Filho per the 2002 Terms and Conditions because the change was never delivered to Plaintiff Filho, even in "Hold Mail."

Curiously, the District Court discussed supposed reasons why Plaintiff Filho was bound by the 2002 Terms and Conditions (JA 217-219), but never addresses the salient point that there is no evidence that Plaintiff Filho ever received even in "Hold

Mail" the purported 2005 Terms and Conditions and thus the 2005 Terms and Conditions could not go into effect as to Plaintiff Filho.

The District Court instead incorrectly states that Plaintiff Filho does not argue that Defendant Bank failed to prepare or attempt delivery of mail (JA 218); but bluntly put, this was flat wrong, as Plaintiff Filho was and is quite clear that the 2005 Terms and Conditions document was not in "Hold Mail" and that he was not otherwise provided or told about the 2005 Terms and Conditions document (JA 146-147).

This case, then, must be considered in light of the facts established in the record that: (i) the customer never received, even in "Hold Mail," the purported new 2005 Terms and Conditions document, which included for the first time a provision specifying arbitration as the means of dispute resolution and which purportedly replaced the 2002 Terms and Conditions document (JA 146-147, JA 57-74), (ii) the customer never signed a writing documenting the change specifying arbitration as the means of dispute resolution (JA 147), and (iii) there was no opt-out as to arbitration (JA 146-147, 184).

## II.

## THE DISTRICT COURT ERRED BY NOT RECOGNIZING NEW YORK LAW THAT AN AGREEMENT TO ARBITRATE MUST BE EXPRESS AND UNEQUIVOCAL

The second error of the District Court was not recognizing New York law that an agreement to arbitrate must be express and unequivocal.

The District Court's Opinion and Order began with a review of the Federal Arbitration Act ("FAA") ,9 U.S.C. §§ 1 *et seq.*. The District Court stated that the FAA applies in the case; the District Court quoted the FAA's policy favoring arbitration agreements; the District Court referred to the FAA provisions for the stay of a lawsuit when there is a valid arbitration agreement; and the District Court determined that under the FAA, the first question is whether the parties agreed to arbitrate. Because of this question, the focus and the relevant body of law for legal analysis moves to contract law, a subject of state substantive law.

"As the U.S. Supreme Court has stressed, arbitration is simply a matter of contract between the parties; it is a way to resolve disputes -- *but only those disputes* -- that the parties have agreed to submit to arbitration." *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F.Supp.2d 189, 192 (E.D.N.Y. 2004), *quoting First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)(emphasis in original in *Stone*). *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995), *quoting*

-25-

*Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489

U.S. 468, 479 (1989)(arbitration under the Federal Arbitration Association is a matter

of "'consent, not coercion.'"); *DIRECTTV, Inc. v. Mattingly*, 376 Md. 302, 321, 829

A.2d 626, 638 (2003)("We never reach the questions controlled by the FAA because

we hold that there was never a valid agreement to arbitrate. . . .").

The issue of whether a party has agreed to arbitration is determined on the basis

of state contract law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. at 943;

*AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643

(1986); *Follman v. World Financial Network National Bank*, 721 F.Supp.2d 158, 161

(E.D.N.Y. 2010); *Cowen & Co. v. Anderson*, 76 N.Y.2d 318, 558 N.E.2d 27, 559

N.Y.S.2d 225 (1990); *Sablosky v. Edward S. Gordon*, 73 N.Y.2d 133, 535 N.E.2d 643,

538 N.Y.S.2d 513 (1989); N.Y. Jur.2d, *Arbitration*, § 12 (2009). Contract

prerequisites under state law -- here, New York -- such as consideration and offer and

acceptance apply to an alleged agreement to arbitrate. *Marek v. Alexander Laufer and*

*Son, Inc.*, 257 A.D.2d 363, 683 N.Y.S.2d 50 (1st Dep't 1999); *Hawkeye Funding Ltd.*

*Partnership v. Duke/Fluor Daniel*, 307 A.D.2d 828, 783 N.Y.S.2d 574 (1st Dep't

2003).

To the question whether there is an applicable and enforceable arbitration

agreement in this case, the District Court recognized that state law determines whether

-26-

the parties agreed to arbitrate, citing _Bell v. Hood_, 293 F.3d 563, 566 (2d Cir. 2002), and that New York law governs the question in this case. (JA 208.) But then the District Court stated that New York courts have not ruled on the specific issue in this case and jumped to consideration of specific credit card cases involving change-of-terms provisions. (JA 208.) (JA 206-207.)

The District Court thus skipped over and did not recognize a point of New York law that provide a needed and proper framework to consideration of the specific issue in this case. Under New York law, a motion to compel arbitration will not be granted unless the parties have "expressly and unequivocally" agreed to arbitrate. _Marlene Industries Corp. v. Carnac Textiles, Inc._, 45 N.Y.2d 327, 380 N.E.2d 239, 408 N.Y.S.2d 410 (1978). The policy of New York law is that one is not compelled to surrender the right to go to court for dispute resolution unless a party has agreed in writing by clear language. _Engler v. Mahoney_, 258 A.D.2d 859,.S.2d 686 N.Y 169 (3d Dep't 1999); _Rochelle Fabrics, Ltd. v. Top Kid's, Inc._, 247 A.D.2d 232, 668 N.Y.S.2d 589 (1st Dep't 1998).

New York courts, applying New York law, have thus disallowed reliance in arbitration provisions in form contracts. An arbitration clause on the reverse side of a seller's written confirmation of buyer's verbal orders was ruled not enforceable. _Marek v. Alexander Laufer and Son, Inc._, 257 A.D.2d 363, 683 N.Y.S.2d 50.

-27-

Similarly, an arbitration clause in a sales confirmation forms issued by seller in response to buyer purchase orders not containing an arbitration clause was held not enforceable. *Alex Gilman Inc. v. Silverman Products & Textiles, Inc.*, 212 A.D.2d 452, 622 N.Y.S.2d 728 (1st Dep't 1995).

These clearly applicable New York law precedents on the requirement for an agreement to arbitrate, including those in the context of form contract, went unrecognized, erroneously, by the District Court when the District Court discussed New York law being applied to interpret the change of terms and conditions provision (JA 213).

## III.

### THE DISTRICT COURT ERRED BY MISREADING THE CREDIT CARD CASES FOR AN UNSUPPORTABLE CONVERSE PROPOSITION

_____The third major error by the District Court was misreading, for an unsupportable converse proposition, a line of credit card cases in which the courts considered the credit card companies' invoking of change-of-terms provisions in credit card contracts so as to specify arbitration as the means of dispute resolution and the courts *rejecting* that change and *denying* motions to compel arbitration. (JA 208-211.)

The District Court reviewed five credit card cases based on the theory that the identical legal issue was posed in these cases when the Banks unsuccessfully moved to compel arbitration in disputes with their credit card customers. The issue was

whether there was an agreement to arbitrate in the circumstances of the Banks' changing the contract to specify arbitration as the means of dispute resolution based solely on the change-of-terms provision.  (JA 208-209.)

## A.    The District Court's Reading Of The Credit Card Cases For A Converse Proposition.

Given the result in these cases that the motions to compel arbitration were denied and the point that the legal issue was said to be identical, it should seem strange that the District Court would attempt to use these credit card cases to support enforcing the Defendant Bank's use of the change-of-terms provision in this case to specify arbitration for dispute resolution.  But that is what the District Court did.

The District Court purported to accept the legal framework provided by these credit card cases, but then to apply New York substantive contract law to interpreting the change of terms provision. (JA 213.)  For that interpretation, the District Court took from the credit card cases a converse proposition from what the credit card cases held: that the credit card cases ruled that the lack of a dispute resolution provision in the credit card contract was the stated reason for limiting the change of terms provisions so as not to allow the credit card company to add an arbitration provision; therefore, in this case, the existence of a provision in the original banking contract having the customer agree to submit to the jurisdiction of certain courts and waiving venue objections allowed Defendant Bank unilaterally to use a change-of-terms clause

-29-

in the original banking contract to amend the banking contract to specify arbitration as the means of dispute resolution.  (JA 214-215.)

**B.**     **A More Detailed Review Of The Credit Card Cases Shows That They Cannot Be Read To Support The District Court's Converse Proposition.**

A more detailed review of the credit card cases shows, however, that those cases cannot be read to support the District Court's converse proposition as to the credit card cases.

**1.**     ***Stone v. Golden Wexler & Sarnese, P.C..***

In *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F.Supp.2d 189, Eastern District of New York Judge Dearie denied Capital One Bank's motion to compel arbitration. Applying Virginia law, Judge Dearie ruled that the change of terms provision did not authorize Capital One Bank to add an arbitration provision to the banking agreement with the customer.

Judge Dearie began his legal discussion by noting that while federal public policy favors arbitration, "Courts may not force parties to arbitrate disputes if the parties have not entered a valid agreement to do so."  341 F.Supp.2d at 192.  Judge Dearie noted that courts apply state contract law to determine if a binding agreement to arbitrate exists and that further, similar to this case:

> It is undisputed that plaintiff made no express, affirmative assent to the addition of the arbitration clause.  There is also little evidence to suggest that plaintiff implicitly consented, much less the "clear, unequivocal and

convincing evidence" required under Virginia law. . . .Indeed, plaintiff contends that she was unaware of the clause until defendant filed the present motion.

341 F.Supp.2d at 192.

The question that the case presented, according to Judge Dearie, was whether the change of terms provision allowed for Capital One Bank to unilaterally add a provision specifying arbitration as the means of dispute resolution. In consideration of that question, Judge Dearie discussed at length *Badie v. Bank of America*, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273 (Cal. Ct. App. 1999), noting among other things that *Badie* recognized "that an interpretation of the [change of terms] clause as granting the bank unbounded authority to make changes, without constraints on the substance of the changes, 'would open the door to a claim that the agreements are illusory.'" *Stone*, 341 F.Supp.2d at 195, *quoting Badie v. Bank of America*, 67 Cal.App.4th at 797, 79 Cal.Rptr.2d at 284-285. Limitation of the change of terms provision was in order; and in that case, Judge Dearie found that the universe of terms included in the original agreement necessarily provided an implied limitation on the bank's power to make unilateral changes to the agreement. Thus, "finance charges, periodic rates, membership fees, payments, and credit limits" were proper subjects for change pursuant to the change of terms provision, but a change making arbitration for dispute resolution was not. 341 F.Supp.2d at 195.

-31-

Judge Dearie also rejected offered distinctions of *Badie*, that in *Badie* there was no opt-out provision from the change making arbitration the means of dispute resolution and there was no explicit allowance for additions to the credit card agreement. These differences were said not to make for a different result in *Stone* and *Badie*. The rejection of these distinctions indicates a broader point: *Stone* cannot be read so narrowly for a proposition that simply because there was not a previous dispute resolution provision in the credit card contract, the change-of-terms provision in the credit card agreement could not be used to make arbitration the means of dispute resolution. The change-of-terms provision required limitation or else there was an illusory agreement; the terms of the credit card agreement provided an implied basis for limitation, but it was not necessarily the only basis.

2.    ***Follman v. World Financial Network National Bank.***

In *Follman v. World Financial Network National Bank*, 721 F.Supp.2d 158, Eastern District of New York Judge Townes denied the credit card company's motion to stay proceedings in favor of arbitration, ruling as a matter of Ohio law that the change of terms provision in the cardholder agreement did not authorize the credit card company to add an arbitration provision for dispute resolution.

Like Judge Dearie in *Stone*, Judge Townes in *Follman* noted the congressional policy favoring arbitration in the FAA, but then stated that "it must first be determined

**-32-**

whether the parties entered into a binding contact to arbitrate" and that "[i]n deciding whether the parties had a valid arbitration agreement, courts apply ordinary state law principles that govern the formation of contracts."  721 F.Supp.2d at 161.

Judge Townes then examined the question whether under Ohio law, there was a valid contract to arbitrate and concluded there was not and determined that the decision in *Maestle v. Best Buy Co.*, 2005 WL 1907282 (Ohio Ap. 8th Dist. 2005), was controlling. Judge Townes read *Maestle* to hold that the change-of-terms provision did not authorize adding an arbitration clause because the change-of-terms provision referenced changes to payments, charges, fees and interest and because the original cardholder agreement did not address dispute resolution.  Judge Townes also found instructive Judge Dearie's decision in *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F.Supp.2d 189.

Judge Townes so ruled even though the change-of-terms provision used the phrase "We may add, change or delete the terms of this Agreement. . . ."  Judge Townes interpreted the original cardholder agreement not to have contemplated the cardholder's dispute resolution rights and thus not subject to the change-of-terms provision.  721 F.Supp.2d at 164-166.  Also, Judge Townes noted that in *Maestle*, there were provisions in the cardholder agreement related to the method, forum, or consequence of a legal dispute between the parties, while in *Follman*, there was a

provision for the cardholder's liability for the credit card company's attorneys fees; but in both cases, these provisions were deemed insufficient to make dispute resolution within the contemplation of the original cardholder agreement. 721 F.Supp.2d at 164-165. As with *Stone*, a narrow reading of *Follman* is not in order; the literal language of the *Follman* change of terms provision was not given effect given the recognized need to limit the change-of-terms provision.

### 3. *Perry v. FleetBoston Financial Corp..*

In *Perry v. FleetBoston Financial Corp.*, No. 04 Civ. 507, 2004 WL 1508518 (E.D. Pa. 2004), the district court in that case denied FleetBoston's motion to compel arbitration. Applying Rhode Island law, the *Perry* court ruled that the change-of-terms provision in the original cardholder agreement did not allow FleetBoston to amend the cardholder agreement to specify arbitration for dispute resolution.

As in *Stone* and *Follman*, the *Perry* court noted that although the FAA establishes a strong federal policy in favor of arbitration, there must be a valid agreement to arbitrate as determined by state law. Under Rhode Island law, in cases involving standardized contracts where one party has superior bargaining power, courts construe ambiguous terms against the drafter. After determining the change-of-terms provision in the original cardholder agreement to be ambiguous, the *Perry* court stated "[a]s Fleet possessed the stronger bargaining position and drafted this

**-34-**

standardized agreement, this Court finds the unilateral Change in Terms authority applies only to those terms already contained or contemplated in the original agreement." 2004 WL 1508518 *4.

On that basis, the _Perry_ court disallowed the change-of-terms provision in the cardholder agreement to authorize adding arbitration for dispute resolution -- a conclusion that the _Perry_ court stated was "especially appropriate given the disparity in the parties' bargaining power," citing _Badie_. 2004 WL 1508518 *4.

Notably, the _Perry_ court commented further that while change-of-terms provisions are necessary due to changing economic conditions, a Bank's authority is not unbridled and cited a case, _Fondedile, S.A. v. C.E. Maguire, Inc._, 610 A.2d 87, 92 (R.I. 1992), "distinguishing between [a Bank's] 'ability to make small modifications in order to . . . accommodate the unexpected' and an attempt to make 'drastic changes' which go 'beyond the scope of the provision providing for changes.'" 2004 WL 1508518 *4. The _Perry_ court further added that if limits were read a into the change -of-terms provision, "credit card holders would find themselves in an Orwellian nightmare, trapped in agreements that can be amended unilaterally in ways they never envisioned." 2004 WL 1508518 *4. As with _Stone_ and _Follman_, a narrow reading of _Perry_ is not in order; the _Perry_ court accepted "small modifications" but rejected "drastic changes" under the change-of-terms provision.

**4.**   ***Sears Roebuck & Co. v. Avery.***

In *Sears Roebuck & Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004), a North Carolina appellate court affirmed the denial of a motion by Sears to compel arbitration with a credit account customer.  The Sears change-of-terms provision was broadly worded, ostensibly empowering Sears to "Change any Credit Limit," "Change any term or condition of this Agreement relating to your account. . .", and "Add any new term or condition to this Agreement relating to your account."  593 S.E.2d at 427.  Yet, the *Avery* court ruled under Arizona law that Sears could not invoke a change of terms provision in the credit account agreement in order to "add" a provision specifying arbitration for dispute resolution.

The *Avery* court first stated that the public policy favoring arbitration does not come into play without the parties entering into an agreement to arbitrate and then examined at length whether there was an enforceable agreement to arbitrate, analyzing three points before interpreting the change of terms provision in that case.  *First*, the *Avery* court reviewed *Badie v. Bank of America*, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, and concluded that the Arizona courts would adopt the same rationale as *Badie* that the parties when entering the account agreement did not intend that the change of term provision should allow a new term such as an arbitration provision.  593 S.E.2d at 429.  *Second*, the *Avery* court, citing among other things § 211 of the Restatement

of Contracts, noted contract law limitations on contracts of adhesion in the reasonable expectation of the adhering party, the obligation of good faith and the unconscionability doctrine. 593 S.E.2d at 429-430. *Third*, the *Avery* court reviewed the case law limiting change of terms provisions so that they would not render agreements illusory, making clear that allowing a party to unilaterally amend a contract rendered the contract illusory. 593 S.E.2d at 431-433.

Only after this discussion of more general contract law principles did the *Avery* court interpret the change of terms provision in that case, adopting the *Badie* approach of limiting the change of terms provisions to changes of existing terms in the credit account agreement. The *Avery* court viewed this rule as consistent with the principle that ambiguous contracts, particularly contracts of adhesion, are construed against the drafter. 593 S.E.2d at 433-434.

Given the elucidation of more general legal principles governing contracts of adhesion and change of terms provisions, however, *Avery* should not be read narrowly, as the District Court did (JA 214), but rather as a case in which the court showed concerns for illusoriness, good faith and reasonable expectations when adopting an interpretation of a change of terms provision that did not allow Sears to unilaterally amend the credit account to add a provision for arbitration.

-37-

5.    ___Badie v. Bank of America___.

In ___Badie v. Bank of America___, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, a California appellate court ruled that a credit card agreement containing a change-of-terms provision did not provide the basis for Bank of America unilaterally imposing an alternative dispute resolution provision in the credit card agreement. As discussed above, the ___Stone___ and ___Avery___ decisions relied significantly on ___Badie___.

As did the courts in ___Stone___, ___Follman___, ___Perry___ and ___Avery___, the ___Badie___ court stated that the public policy favoring arbitration is not operative unless the parties have entered into an enforceable agreement to arbitrate, commenting that when the lower court glossed over this threshold issue and considered the validity of the Bank's amendment in terms of the public policy favoring arbitration, "it put the cart before the horse." 67 Cal.App.4th at 790, 79 Cal.Rptr.2d at 280.

The ___Badie___ court then analyzed the meaning and scope of the change-of-terms provision, treating it as subject to the duty of good faith and fair dealing. On that ground, the ___Badie___ court rejected the Bank of America's modification to add the arbitration provision. The ___Badie___ court stated that the duty of good faith requires that the party holding the discretionary power under the change of terms provision to exercise it for purposes within the reasonable contemplation of the parties at the time of contract formation. 67 Cal.App.4th at 796, 79 Cal.Rptr.2d at 284. The ___Badie___ court

-38-

also recognized that "permitting the Bank to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted, would open the door to a claim that the agreements are illusory." 67 Cal.App.4th at 797, 79 Cal.Rptr.2d at 284-285.

The *Badie* court then concluded that application of the rules of contract interpretation results in the conclusion that the customers did not consent to allowing the Bank of America to change the terms of the credit account agreement to make arbitration the means of dispute resolution: "there is nothing about the original terms that would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* ADR on the customer." 67 Cal.App.4th at 801, 79 Cal.Rptr.2d at 287; emphasis in the original. The *Badie* court added that a narrow interpretation of the change-of-terms provision did not render the provision as mere surplusage because "[t]he Bank may still invoke it to modify fees, grace periods, annual percentage rates and so forth, subject to the Bank's duty of good faith and fair dealing." 67 Cal.App.4th at 803, 79 Cal.Rptr.2d at 289.

\* \* \* \* \*

The foregoing review of the credit card cases indicates that they should not be read to support the District Court's converse proposition that the existence of a

provision for the customer to submit to certain courts' jurisdiction would allow Defendant Bank to use the change of terms provision to specify arbitration for dispute resolution. Rather, acceptance of the framework of these credit card cases, as the District Court professed to do, is more consistent with conclusion that in this case, the Defendant Bank's use of change-of-terms provision to specify arbitration for dispute resolution was not enforceable -- a point discussed further below (pp xx-xx).

## IV.

## THE DISTRICT COURT ERRED BY READING TWO NEW YORK CASES, ONE REVERSED AND ONE INAPPOSITE, AS SUPPORTIVE OF THE DISTRICT COURT'S CONVERSE PROPOSITION

The fourth major error of the District Court was reading two New York cases, one a reversed decision involving trade merchants and American Express and the other an inapposite 73-year old decision involving a Bank by-law amendment authorized by statute governing lost passbooks, as supportive of the District Court's converse proposition from the credit card cases. The two cases cannot properly be so read.

### A.     *In re American Express Merchants Litigation.*

The first case cited, *In re American Express Merchants Litigation*, No. 03 Civ. 9562, 2006 WL 662341 (S.D.N.Y. 2006), *rev'd*, 554 F.3d 300 (2d Cir. 2009), *vacated and remanded for further consideration*, 599 U.S. __, 130 U.S. 2401 (2010), is not good authority. In a case between American Express and groups of trade merchants,

the group of pre-1999 plaintiffs objected to American Express's use of a change-of-terms provision to specify arbitration for dispute resolution. The _American Express_ district court compelled arbitration as to the pre-1999 plaintiffs, finding that the change to arbitration was within the original contemplation of the parties, and on that basis distinguished _Stone_ and _Perry_. The _American Express_ district court also ordered arbitration as to the other plaintiffs who always had arbitration in their agreements. The _American Express_ district court's decision compelling arbitration was, however, reversed by this Court, which held that mandatory class action waiver provision in the arbitration clause was unenforceable because it would grant de facto immunity from federal antitrust liability. The U.S. Supreme Court in turn vacated and remanded for further consideration in light of _Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp._, 599 U.S. __,130 S.Ct. 1758 (2010).

The reversed district court decision in _In re American Express Merchants Litigation_ cannot be considered good authority, as the district court's discussion was relatively brief and the case had a much different factual and procedural context. The plaintiffs were merchants acquainted with arbitration, and the post-1999 plaintiffs had arbitration provisions in their original agreements, so that not to allow the use of the change-of-terms provision to effect arbitration for dispute resolution with respect to the pre-1999 plaintiffs would have meant a carving out of a group of plaintiffs from

**-41-**

the order to compel arbitration.

**B.      _Krupp v. Franklin Savings Bank in City of New York_.**

The second case cited, _Krupp v. Franklin Savings Bank in City of New York_, 255 A.D. 15, 5 N.Y.S.2d 365 (1st Dep't 1938), is inapposite.  The action sought recovery of a sum of money on deposit at the Franklin Savings Bank.  When the money was originally deposited in a savings account, the customer signed a signature card, which constituted the contract, stating that the customer agreed to the by-laws and any amendments or additions that might thereafter be made part of the contract. The dispute in the case concerned an amended by-law requiring the posting of a bond in the event of lost passbooks when there was a withdrawal.  The Bank adopted that amendment "pursuant to the authority granted by statute" -- the New York Banking Law.  The First Department thus ordered that the customer could have the money on deposit upon posting of the bond.  255 A.D. at 17-18, 5 N.Y.S.2d at 368.

The circumstances and issues in _Krupp v. Franklin Savings Bank in City of New York_ were very different from those in this case.  A 73-year old decision case concerning the effectiveness of a Bank by-law amendment adopted pursuant to statutory authority to govern treatment of lost passbooks does not provide any guidance as to whether a Bank can invoke a change of terms provision in a banking contract so as to specify arbitration for dispute resolution.

-42-

**V.**

**THE DISTRICT COURT ERRED IN INTERPRETING THE CHANGE-OF-TERMS PROVISION IN THIS CASE TO AUTHORIZE DEFENDANT BANK TO SPECIFY ARBITRATION FOR DISPUTE RESOLUTION BASED ON A LITERAL READING OF THE 2002 TERMS AND CONDITIONS AND THE DISTRICT COURT'S CONVERSE PROPOSITION FROM THE CREDIT CARD CASES**

The fifth major error of the District Court was interpreting the change-of-terms provision in this case to authorize Defendant Bank to specify arbitration for dispute resolution based on a literal reading of the 2002 Terms and Conditions and the District Court's converse proposition from the credit card cases.

**A.    The District Court's Interpretation Of The Change-Of-Terms Provision.**

The District Court's interpretation of the change-of-terms provision began by stating he "agrees with the legal framework set forth in *Stone, Follman*, and *Badie*, etc., but applies New York's substantive law to the interpretation of the scope of the [2002] IBTC's 'change of terms' provision."  (JA 213.)  According to the District Court, New York law requires that contracts be construed in accordance with the parties' intent as evidenced by the written terms, citing *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565, 569 (2002).  (JA 213.)  Also, according to the District Court, an unambiguous agreement is enforced as written, citing *Greenfield v. Philles Records, Inc.*, but an ambiguous standardized

-43-

contract requires construing the ambiguity against the drafter, citing *Westchester Resco Co., LP v. New England Reinsurance Corp.*, 818 F.2d 2,3 (2d Cir. 1987). (JA 213-214.)

The District Court then proceeded to examine whether the 2002 Terms and Conditions authorized Defendant Bank to modify the contract to require customers to arbitrate disputes. (JA 214-215.) The District Court did so on the basis of the language of the 2002 Terms and Conditions, which required that the 2002 standardized Terms and Conditions document be determined to be unambiguous. The District Court did not, however, find that the 2002 standardized Terms and Conditions were unambiguous, but rather recognized, somewhat incongruously, that the change-of-terms provision was "broadly worded" in reserving the right to Defendant Bank "to change these Terms and Conditions." (214, 67.)

The District Court nevertheless read the change-of-terms provision literally to refer to the pre-existing "Terms and Conditions" in the 2002 Terms and Conditions document. Contrasting the lack of any dispute resolution provision in the credit account contract in the *Avery* case, the District Court quoted the provisions in this case for customers to submit to the jurisdiction of certain courts and to waive forum non convenience and venue objections in the 2002 Terms and Conditions. (JA 215, 53.) These provisions, stated the District Court, "put Plaintiff on notice that these

-44-

forum and dispute resolution provisions were subject to change." (JA 215.) Thus, according to the District Court, "Plaintiff agreed to let Defendant make such a change by his signature on the account application whereby he acknowledged that he received, understood, and agreed to the [2002] IBTC," giving Defendant Bank "contractual authority to replace the 2002 'Consent to Jurisdiction; Waivers' clause with the 2005 arbitration clause." (JA 215.)

## B. The District Court's Interpretation Of The Change-Of-Terms Provision Was Erroneous.

The District Court's interpretation of the change-of-terms provision was erroneous for at least five reasons.

### 1. New York Law Requires An Express And Unequivocal Agreement To Arbitrate That Was Not Provided By Plaintiff Filho Signing An Account Application.

The first reason is that as discussed above (pp. 25-28), New York law requires an express and unequivocal agreement to arbitrate; and such an express and unequivocal agreement to arbitrate was simply not provided by the act of Plaintiff Filho signing an account application ostensibly binding himself to an 11-page 2002 Terms and Conditions document in small print that included a change-of-terms provision.

Nothing in the 2002 Terms and Conditions refers to arbitration, much less contains an express and unequivocal agreement to arbitrate. The District Court's

reference to the "Consent to Jurisdiction; Waivers" provision as giving notice to Plaintiff Filho that Defendant Bank might unilaterally change the contract to arbitration is not remotely an express and unequivocal agreement to arbitrate. Further, the District Court's decision upholding Defendant Bank's use of a change-of-terms provision in a 11-page standardized banking contract cannot be squared with decisions of New York courts, applying New York law, that have disallowed reliance in arbitration provisions in form contracts for lack of the requisite express and unequivocal agreement. *Marek v. Alexander Laufer and Son, Inc.*, 257 A.D.2d 363, 683 N.Y.S.2d 50; *Alex Gilman Inc. v. Silverman Products & Textiles, Inc.*, 212 A.D.2d 452, 622 N.Y.S.2d 728.

### 2. The Credit Card Cases and Other Cases Do Not Support The District Court's Converse Proposition.

The second reason that the District Court's interpretation of the change-of-terms provision is erroneous is that, as discussed above (pp. 28-42), the District Court's converse proposition from the credit card cases is not supported by those credit card cases and the other two cases cited by the District Court. The credit card cases ruled against the credit card company's use of change-of-terms provisions to add, in the credit agreement, arbitration for dispute resolution; and while the credit card cases stated a ground upon which to provide a necessary limitation on the scope of the change-of-terms provisions, these cases reflected more general contract law

limitations on contracts of adhesion and change-of-terms provisions.

### 3. Court Litigation Is The Default Means Of Dispute Resolution.

The third reason that the District Court's interpretation of the change-of-terms provision is erroneous is that the District Court, in placing decisive weight on whether or not there is in the credit card or banking contract a dispute resolution mechanism specifying court litigation, misses the point that whether or not the credit card or banking contract specifies court litigation as the means of dispute resolution, the means of dispute resolution will still be court litigation.

In both (a) the situation of the credit card or banking contract having no dispute resolution provision and (b) the situation of the credit card or banking contract having a dispute resolution provision specifying court litigation, a Bank seeking to invoke a change-of-terms provision to specify arbitration for dispute resolution is changing the means of dispute resolution from court litigation to arbitration. In both situation (a) and situation (b), the change is the same.

Accordingly, a distinction cannot reasonably be drawn between the two situations so as to say that in situation (a), where there is no provision in the banking contract for dispute resolution and court litigation is the means of dispute resolution by default, the Bank cannot invoke the change of terms provision to specify arbitration as the means of dispute resolution, but that in situation (b), where there is

a provision in the banking contract for court litigation as the means of dispute resolution and court litigation is the means of dispute resolution, the Bank can invoke the change of terms provision to specify arbitration as the means of dispute resolution.

There are circumstances in situation (a) that provide a basis for limiting the scope of a change-of-terms clause given that there is no prior contract term to be changed. At the same time, however, it needs to be recognized that *Follman* and *Avery* were both cases where the change-of-terms provision included the word "add" as well as "change" so as to allow literally a new term to be added, and yet the credit card companies in those cases were still not allowed to "add" an arbitration provision; a literal reading of the change-of-terms provisions in those cases did not account for those court rulings. In *Perry*, a distinction was "small modifications" suitable for change per the change-of-terms provision and "drastic changes" that were not. 2004 WL 1508518*4.

As will be discussed below in connection with contract law limitations on standardized contracts and change-of-terms provisions, at work are certain concerns that dictate limitations be placed on the scope of change-of-terms provisions in contracts of adhesion whether or not there is a provision in the banking contract for court litigation as the means of dispute resolution.

-48-

### 4. The District Court's Interpretation Is Inconsistent With General Contract Law Limitations On Contracts of Adhesion.

_____The fourth reason that the District Court's interpretation is erroneous is that it is inconsistent with general contract law limitations on contracts of adhesion.

The 2002 Terms and Conditions and the purported 2005 Terms and Conditions in this case are unquestionably standardized contracts, sometimes called contracts of adhesion, as to which a customer essentially takes it or leaves it without a realistic opportunity to bargain. *Sears Roebuck and Co. v. Avery*, 593 S.E.2d at 430; *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 150, 840 P.2d 1013, 1015 (Ariz. S.Ct. 1992); *Godfrey v. Eastman Kodak Co.*, 1991 WL 64463 *3-4 (S.D.N.Y. 1991); *Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 356, 133 Cal. Rptr. 775, 783 (1976); E.A. Farnsworth, *Contracts*, § 4.26, 285-294 (4th ed. 2004).

The record in this case corresponds to that description of a contract of adhesion: when the account was opened, Defendant Bank's officer Mr. Naslausky had Plaintiff Filho sign an "Acknowledgment" in a "Special Services" document that has Plaintiff Filho agreeing to the 2002 Terms and Conditions contract that he was in fact not shown and not given at the time. (JA 76, 146.) Aptly, comment b to § 211 of the Second Restatement of Contracts states: "Customers do not in fact ordinarily understand or even read the standard terms. They trust to the god faith of the party using the form and to the tacit representation that like terms are being accepted

**-49-**

regularly by others similarly situated."

It is recognized in the Second Restatement of Contracts and by the courts that the enforceability of a contract of adhesion is especially affected by three legal doctrines: (i) the reasonable expectation of the adhering party; (ii) the overriding obligation of good faith and fair dealing; and (iii) the unconscionability doctrine. Second Restatement of Contracts, § 211 and comments; *Sears Roebuck and Co. v. Avery*, 593 S.E.2d at 430-431; *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 392, 682 P.2d 388, 397 (Ariz. S.Ct. 1984); *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. at 151-152, 840 P.2d at 1016-1017; *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 820, 171 Cal. Rptr. 604, 612, 623 P.2d 165, 172-173 (1981).

It follows that these legal doctrines do not permit for the kind of literal reading of the Terms and Conditions documents in this case as done by the District Court as the basis for interpretation. Notably, *Follman* and *Avery* eschewed literal reading of the change-of-terms provisions in their cases; *Follman*, *Perry* and *Avery* found the change-of-terms provision before them to be ambiguous and thus requiring the ambiguity in the standardized contract to be construed against the drafter Bank; *Perry* further expressed a concern about the disparity in bargaining power between the credit card company and the customer.

Those cases and others concerning contracts of adhesion counsel a realistic consideration of whether a change such as specifying arbitration as the means of dispute resolution was within the reasonable expectation of the customer, keeping in mind the bank's obligations of good faith and conscionable action. The District Court's reliance on a "Consent to Jurisdiction; Waiver" section in small print in an 11-page Terms and Conditions document with 31 numbered sections in small print as giving notice to a lay person that the Bank may invoke the "Amendments; Construction and Effect" section to adopt arbitration for dispute resolution is absurdly unrealistic given the realities of contracts of adhesion.

### 5. The District Court's Interpretation Is Inconsistent With General Contract Law Limitations On Change-Of-Terms Provisions.

_____The fifth reason that the District Court's interpretation of the change-of-terms provision is erroneous is that it is inconsistent with general contract law limitations on change-of-terms provisions.

The District Court had before it a case involving a bank-customer relationship with a standardized contract (JA 45-55) that contained a change-of-terms provision stating "The Bank reserves the right to change these Terms and Conditions as well as schedule of charges and to add any new charges." (JA 53.) Such a provision, if not limited with respect to the changes it could effect, would render the contract illusory and unenforceable because one party, the bank, could amend and change the

-51-

contract at will.  *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F.Supp.2d at 195;

*Badie v. Bank of America*, 67 Cal.App.4th at 797, 79 Cal.Rptr.2d at 284-285; *Webb*

*v. GAF Corp.*, 936 F.Supp. 1109, 1120 (N.D.N.Y. 1996)(contract illusory "if GAF

reserved to itself the discretion unilaterally to change the terms").

As courts have recognized, nothing is more illusory than to allow a party to

change or amend unilaterally a contract based on a change of terms or right to amend

provision.  *Sears Roebuck and Co. v. Avery*, 593 S.E.2d at 431-432; *Demasse v. ITT*

*Corp.*, 194 Ariz. 500, 508, 984 P.2d 1138, 1146 (Ariz. S.Ct. 1999).  "[P]ermitting the

Bank to exercise its unilateral rights under the change of terms provision, without any

limitation on the substantive nature of the change permitted, would open the door to

a claim that the agreements are illusory."  *Badie v. Bank of America*, 67 Cal.App.4th

at 797, 79 Cal.Rptr.2d at 284-285; *Stone v. Golden Wexler & Sarnese, P.C.*, 341

F.Supp.2d at 195 (quotes *Badie*).

The recognition that a change-of-terms provision, if read literally without

limitation, would render an agreement illusory and thus not enforceable requires that

the change-of-terms provision be read as necessarily having limitations in order for

it to be enforceable. *Badie v. Bank of America*, 67 Cal.App.4th at 796, 79 Cal.Rptr.2d

at 284 (emphasizes good faith duty as limitation); *Perry v. FleetBoston Financial*

*Corp.*, 2004 WL 1508518 *4 (emphasizes reasonable expectation of parties as

limitation that was especially appropriate given disparate bargaining power of parties).

The change-of-terms provision will not render the contract illusory "if the exercise of this power [to change terms] is subject to prescribed or implied limitations, so that the variation must be in proportion to some objectively determined base or must be reasonable." *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F.Supp.2d at 195, *quoting Badie v. Bank of America*, 67 Cal.App.4th at 796, 79 Cal.Rptr.2d at 285, *Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 6 Cal.Rptr. 31 (1960), and *Corbin on Contracts*, § 98, p. 311; *Lamb v. Emhart Corp.*, 47 F.3d 551, 560 (2d Cir. 1995)(ascertainable standards required for change-of-terms provision).

If in the situation of the banking contract having a dispute resolution provision specifying court litigation, a Bank may invoke a change-of-terms provision to specify arbitration for dispute resolution, make a number of other major changes and there is no opt-out available to the customer, then the problem of having an illusory agreement still exists. Only by restricting the changes to what the *Perry* court called "small modifications" is the problem of illusoriness really solved. Indeed, this case illustrates the problem: as discussed next, Defendant Bank invoked the change-of-terms provision to replace the 2002 Terms and Conditions in their entirety with the purported 2005 Terms and Conditions.

# VI.

## THE DISTRICT COURT ERRED IN REJECTING APPLICATION OF § 5-1103 OF THE NEW YORK GENERAL OBLIGATIONS LAW BECAUSE THE DISTRICT COURT OVERLOOKED THAT WHAT DEFENDANT BANK PURPORTEDLY DID IN 2005 WAS TO REPLACE THE TERMS AND CONDITIONS IN THEIR ENTIRETY

The sixth major error of the District Court was in rejecting application of § 5-1103 of the New York General Obligations Law requiring a contract modification, if not supported by consideration, to be in a writing signed by the parties. (JA 215-217.) The District Court overlooked that what Defendant Bank purportedly did in 2005 was to replace the 11-page 2002 Terms and Conditions (JA 45-55) in their entirety with the 18-page 2005 Terms and Conditions (JA 57-74).

As the District Court recognized, § 5-1103 of the New York General Obligations Law provides that "An agreement, promise or undertaking to change or modify, or discharge in whole or in part, any contract . . . shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract . . . shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent." The District Court ruled that this provision did not apply to the purported 2005 change to arbitration for dispute resolution because of the change-of-terms provision in the 2002 Terms and Conditions document, citing *Badie*

*v. Bank of America* and *Lamb v. Emhart Corp.* for the proposition that change of

terms provisions are permissible. (JA 216-217.)

The *Badie* and *Lamb* cases are, however, more properly cited for the

proposition that change of terms provisions require ascertainable limits in order to be

enforceable (*see* pp. 38-39, 51-53 above); and those limits point to the problem here

in rationalizing away the application to this case of § 5-1103 of the New York

General Obligations Law when what Defendant Bank purportedly did in 2005 was

to replace the Terms and Conditions in their entirety. (*See* JA 45-55, 57-74, 183-

184.) Ostensibly, this was not a simple change of one term, but a wholesale

replacement of a contract document: the 11-page 2002 Bank Terms and Conditions

document (JA 45-55) was supposedly replaced by the 18-page 2005 Terms and

Conditions document (JA 57-74). Such a replacement, with no opt-out, must be

considered a contract modification subject to § 5-1103 of the New York General

Obligations Law, or else the change of terms provision is used in an unlimited way

so as to render it illusory and unenforceable (*see* pp. 51-53 above).

Section 5-1103 of the New York General Obligations Law was unquestionably

not satisfied in this case. Plaintiff Filho never signed the 2005 Terms and Conditions

document, as he never received, not even in "Hold Mail," the 2005 Terms and

Conditions document. (JA 146-147.) It follows that the 2005 Terms and Condition

document with its arbitration provision was not enforceable as to Plaintiff Filho.

## VII.

### THE DISTRICT COURT ERRED FACTUALLY AND LEGALLY WHEN REJECTING PLAINTIFF FILHO'S ARGUMENT THAT HE NEVER AGREED TO ARBITRATION OF DISPUTES

The seventh major error of the District Court was to reject Plaintiff Filho's argument that he never agreed to arbitration of disputes: (A) the District Court's Opinion and Order on this point regrettably consisted of a misfocused series of inaccuracies and irrelevancies, with the consequence that the District Court failed to address the indisputable fact that Plaintiff Filho never received, even in "Hold Mail," the 2005 Terms and Conditions document and thus its arbitration provision could not become effective as to Plaintiff Filho per the change of terms provision in the 2002 Terms and Conditions document; and (B) the District Court was legally wrong when stating that Plaintiff Filho was bound by the arbitration provision in the 2005 Terms and Conditions document.

### A.     The District Court's Clearly Erroneous" Treatment Of The Record.

With respect to this point, the District Court first noted Plaintiff Filho's testimony that he never received or read either the 2002 Terms and Conditions document or the 2005 Terms and Conditions document and then cited two cases, _Tsadilas v. Providian National Bank_, 13 A.D.3d 190, 786 N.Y.S.2d 478, 480 (1st

Dep't 2004), and *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 252, 676 N.Y.S.2d 569, 573 (1st Dep't 1998), for the proposition that a party is bound by an agreement even if the party does not read it. (JA 217-218.) In fact, Plaintiff Fiho testified: (i) that when he opened the account, he was not given a copy of the 2002 Terms and Conditions document and thus did not read it, but that a copy of the 2002 Terms and Condition document minus the first page was in "Hold Mail"; (ii) that he never received and thus never read the 2005 Terms and Conditions document and that the 2005 Terms and Conditions document was not in "Hold Mail"; and (iii) Plaintiff Filho did not agree and would not have agreed to arbitration. (JA 141-142, 146-147.)

While the District Court made a point that Plaintiff Filho signed the Special Services Agreement binding Plaintiff Fiho to the 2002 Terms and Conditions (JA 217-218), the 2002 Terms and Conditions did not include an arbitration provision (JA 45-55). As discussed above (pp. 21-24), it was the supposed 2005 Terms and Conditions document that had the arbitration provision; without its delivery to Plaintiff Filho, none of the 2005 Terms and Conditions could arguably be effective as to Plaintiff Filho per the 2002 change of terms provision; the testimony of Defendant Bank's Chief Compliance Officer Peter Javier did not make any statement about the delivery of the 2005 banking contract containing the arbitration provision to Plaintiff Filho (JA 183-184); and given that there was no evidence in the record

supporting the delivery, even to "Hold Mail," of the purported 2005 Terms and Conditions to Plaintiff Filho, there was no basis to hold Plaintiff Filho to the arbitration provision in the purported 2005 Terms and Conditions document (pp. 21-24 above). Legal precedents about the legal effect of not reading an agreement were thus beside the point given the failure to deliver the 2005 Terms and Conditions document to Plaintiff Filho.

As also discussed above (p. 24), it was flat wrong when the District Court stated, incorrectly, that Plaintiff Filho does not argue that Defendant Bank failed to prepare or attempt delivery of mail (JA 218); Plaintiff Filho was and is quite clear that the 2005 Terms and Conditions document was not in "Hold Mail" and that he was not in any manner provided or told about the 2005 Terms and Conditions document (JA 146-147), and there is no evidence in the record contradicting that point (pp. 21-24 above). The District Court's misfocus on Plaintiff Filho's delay in asking for "Hold Mail" (JA 219) can therefore only be viewed as an erroneous failure to address what is critical concerning the facts.

It follows that the District Court's conclusion that Plaintiff Filho was bound by the arbitration provision in the 2005 Terms and Conditions document because of his agreement to the change-of-terms provision in the 2002 Terms and Conditions document (JA 219) is based on a clearly erroneous treatment of the facts.

**B.      The District Court Was Legally Wrong In Holding**
**Plaintiff Filho Was Bound To Arbitration.**

For the reasons discussed above in Points III and V of the Argument (pp. 28-40, 43-53 above), the District Court was also legally wrong in holding Plaintiff Filho bound to the arbitration provision in the purported 2005 Terms and Conditions document based on the change of terms provision in the 2002 Terms and Conditions document.

## CONCLUSION

For the reasons discussed above, this Court should: (i) reverse the grant of Defendant Bank's motion to compel arbitration and dismissal of the action, (ii) remand the case to the District Court for trial and (iii) grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York           **NESENOFF & MILTENBERG, LLP**
        **October 24, 2011**

                            **By:**_____

                               **Philip A. Byler**, **Esq. (PB 1234)**
                               **Andrew T. Miltenberg, Esq, (AM 7006)**

                            **Attorneys for Plaintiff-Appellant Delio**
                                **Alosio Mattos Santos Filho**
                            **363 Seventh Avenue - Fifth Floor**
                            **New York, New York 10001**
                            **212.736.4500**

-59-

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this Appellant's Brief was produced in Times New Roman (a proportionally-spaced typeface), 14-point type and contains 13,437 words (based on Corel Word Perfect processing system word count function).

**Dated: New York, New York**
**October 24, 2011**

**NESENOFF & MILTENBERG, LLP**

**By:**_____
**Philip A. Byler**, **Esq. (PB 1234)**

**Attorneys for Plaintiff-Appellant Delio**
**Alosio Mattos Santos Filho**
**363 Seventh Avenue - Fifth Floor**
**New York, New York 10001**
**212.736.4500**